[No. 52522–6. En Banc. April 16, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. ANTHONY J. ESCOTO, *Appellant.*

2

*Nancy L. Talner* and *Dori Jones* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney, Linda Walton, Assistant Chief Deputy,* and *David S. Vogel, Deputy,* for respondent.

*William H. Griffies, Prosecuting Attorney for Pierce County,* and *Carolyn O. Williamson, Deputy,* amici curiae for respondent.

BRACHTENBACH, J.—This appeal by a juvenile arises from a sentence outside the standard range. The essential issue is whether the proceedings violated the juvenile's Fifth Amendment privilege against self–incrimination.

The juvenile pleaded guilty to theft in the second degree. With his criminal history the standard range was 21 to 28 weeks. The court imposed an 80–week sentence after appropriate hearings and findings. We affirm.

At the time of the offense and at sentencing the juvenile was 12 years of age. At the time of sentencing, he had convictions for three burglaries, five thefts, four simple assaults, one possession of stolen property, one malicious mischief, and theft in the second degree, the latter being the subject of the sentencing and this appeal.

Understandably, the court made these findings of fact:

7. Disposition within the standard range would fail to protect the citizenry from the respondent's criminal behavior because the respondent's behavior is escalating in frequency and degree of violence. Dr. Von Cleve's report indicates that Anthony derives pleasure from injuring others and his behavior will worsen unless intervention is ordered.

8. Disposition within the standard range would fail to make the respondent accountable for the offense because the respondent is out of control and long–term treatment

is necessary to impact Anthony.

9. Disposition within the standard range would fail to provide necessary treatment and supervision of the respondent because Dr. Von Cleve's Report indicates that any treatment plan less than two years would have inconsequential impact.

10. Disposition within the standard range would pose a serious and clear danger to society beyond a reasonable doubt.

11. The sentence imposed by the Court in this matter is reasonably related to the purposes of the Juvenile Justice Act of 1977.

Supplemental Clerk's Papers, at 2–3.

At a preliminary hearing in October, the caseworker told the court that the juvenile is "dangerous, and extremely dangerous". He recommended that there be a psychological evaluation, stating "I would hate to have to recommend, which by law I could, four years in the State institution just to cover all the bases." Motion Hearing, Oct. 16, 1985, at 2–3.

 When defense counsel objected to any evaluation for any purpose, the court noted that it believed it had inherent authority to order an evaluation. The court stated that any evaluation would relate only to matters for which the juvenile had been found guilty and not any unadjudicated charge. The court quite accurately said: "the purpose of this whole thing is to allow the Court . . . to have adequate information in order to reach a decision, that is the most fundamental issue, the public policy regarding the privilege [Fifth Amendment] once there has been a conviction, becomes secondary to that." Motion Hearing, Oct. 16, 1985, at 11–12. The court, nonetheless, granted defense counsel the right to be present at the evaluation interview; defense counsel chose not to attend.

At the November disposition hearing the court heard from both counsel, the juvenile's father, the juvenile, the caseworker and the evaluating psychologist; the court received written reports from the psychologist and the probation officer.

The court concluded: "Well, I think it is overwhelmingly clear that a sentence outside of the standard range is essential here, both to protect the public, and to protect the respondent." Disposition Hearing, Nov. 8, 1985, at 14. Further,

I think the basis for the finding of Manifest Injustice lies in the recent criminal history, lies in the report of Dr. Von Cleve particularly in the concerns that are expressed about the nature of the assaultive behavior, the lack of remorse or understanding of the impact on the victims, and I think the somewhat callous or disregard for people in general that the young man has shown. I think that presents an extremely high risk of reoffending so that clearly the evidence is overwhelming and beyond a reasonable doubt that this young man represents a clear danger to society.

Having said that we have to function I think in a way that meets those demands, but also meets the demands of his eventual release into society. . . .

Disposition Hearing, Nov. 8, 1985, at 15–16. On the theft charge the court held:

And finally on the Theft in the second degree, I am going to go beyond the standard range, and impose a maximum of 80 weeks in the institution. I say that with the idea that that will give the department I think a long enough time to deal with him in a way that I think is of such a length that they can make some progress, but also have some light at the end of the tunnel, so that depending on how he reacts, he can determine where he goes from there, and when. And I think he needs to have some of the responsibility for that as well as the State. I am deeply troubled by his age, by the course that his life has taken up to now—I just hope that we are doing it early enough, and I hope that professionals are telling me that we can make a substantial change so that as he reaches his teen years, particularly his middle to late teen years he will have some semblance of understanding, and better behavior.

Disposition Hearing, Nov. 8, 1985, at 16–17.

The juvenile's major reliance is upon *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981). The facts of *Estelle* destroy its relevance. It was a death penalty

case. The State used in the death penalty phase a pretrial psychiatric examination, informally ordered by the court sua sponte, administered to determine competency to stand trial. However, the State went further. It relied upon testimony of the psychiatrist which went far beyond the contents of the written, pretrial report. The doctor was the State's only witness on the critical issue of future dangerousness, a matter never addressed in the written report.

The *Estelle* Court specifically stated that the first issue was whether the privilege against compelled self–incrimination was violated "because [defendant] was not advised before the pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a sentencing proceeding." *Estelle,* at 461. Additionally, the trial court had ordered the State to disclose the witnesses it planned to use in both the guilt and the penalty phase. The trial court had granted a defense motion to bar the testimony of any witness not named on the State's list. The doctor's name did not so appear.

It is clear the Supreme Court rested its holding upon the fact that it was a death penalty case. It referred to the nature of the statement and "the exposure which it invites." *Estelle,* at 462 (quoting *In re Gault,* 387 U.S. 1, 49, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967)). It referred to the ultimate penalty of death, to the defendant being an instrument of his own execution, and to the gravity of the decision. It noted an insistence that capital sentencing procedures be unusually reliable. *Estelle,* at 462–63, 468.

Further, at the time of the pretrial psychiatric examination, counsel had been appointed for the defendant. Counsel was not notified of the examination which took place in the jail, lasting 90 minutes.

Highly significant is the Supreme Court's own limitation upon the *Estelle* holding. The Court said: "Of course, we do not hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a

sentencing determination." *Estelle,* at 469 n.13.

The juvenile also relies upon *State v. Ammons,* 105 Wn.2d 175, 713 P.2d 719, 718 P.2d 796 (1986). There we upheld the sentences in that case, but the opinion states: "However, all encounters, examinations and interviews do not necessarily present the same Fifth Amendment concerns." *Ammons,* at 185. *Ammons* is of no aid to the juvenile. It involved adults being sentenced under the specific provisions of the Sentencing Reform Act of 1981, RCW 9.94A, which is not applicable to juvenile proceedings.

In contrast, here the court ordered that the juvenile's attorney had a right to be present at the evaluation interview and presumably render whatever advice was appropriate. Prior to the evaluation, defendant's counsel told the court "that the Court would expect me to be present if I wanted to be, and if my client wanted me to be present at this evaluation. My advice to my client would be under the Fifth Amendment to refuse to participate in any evaluation whatsoever." Motion for Reconsideration Hearing, Oct. 25, 1985, at 6. The court indicated it would rule upon that question if such a situation developed.

Defense counsel chose not to be present at the evaluation; the juvenile obviously participated without objection and without asserting a right to remain silent. The juvenile was in court when the colloquy about remaining silent took place. The defendant has made no record as to what advice was given him by his counsel nor why counsel absented himself from the evaluation. While the defendant raised the question in court before and after the evaluation, his attorney, for whatever reason, did not appear at the evaluation. The court had ordered that counsel had a right to be present. Considering the totality of the circumstances, on this record there was a waiver, even if the privilege attached.

A sincere, sensible and concerned trial judge was attempting to fashion the best disposition of a juvenile very much in need of all the help the system could provide. The

juvenile's criminal history was such that a disposition outside the standard range was virtually inevitable. The trial court was seeking the most thorough information it could obtain to help this youngster and still protect society against an increasingly dangerous child. The court was precisely careful to limit use of the evaluation to matters already adjudicated and to permit presence of counsel. That is a far cry from the facts and indeed the holding of the *Estelle* death penalty case.

Quite apart from the psychologist's report, the court had before it the report from the probation counselor to which no objection was raised. That report contained information quite similar to that of the psychologist. It concluded that the juvenile's attitude was not conducive to short term treatment. It stated that the juvenile expressed no empathy or sympathy for his victims and basically wants to spend his time hassling people. The probation counselor's recommendation was as follows:

> Tony needless to say, continues to offend at an alarming rate.
> There are six criteria established for Manifest Injustice finding. Only one is needed for the finding to hold up. Tony's offenses and behavior place him in four of the six categories. I therefore strongly recommend that the court follow my recommendations for a Manifest Injustice finding and sentence Tony to a maximum of 104 weeks with the Department of Juvenile Rehabilitation.

State's Exhibit 1, at 8.

The psychologist likewise recommended a sentence of 104 weeks. The court imposed a maximum of 80 weeks.

The juvenile act itself recognizes the difference between the adjudicatory state and disposition. RCW 13.40.140(8) provides in part:

> (8) A juvenile shall be accorded the same privilege against self–incrimination as an adult. An extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding may not be received in evidence at an adjudicatory hearing over objection.

Affirm.

DOLLIVER, ANDERSEN, and CALLOW, JJ., concur.

DURHAM, J. (concurring)—I agree with the majority that the trial court's sentence should be affirmed, but on a more limited basis. Escoto contends that the trial court's use of the results of the psychological evaluation as a basis for a "manifest injustice" finding violated his privilege against self–incrimination under the Fifth and Fourteenth Amendments. The threshold question that must be considered is if the constitutional privilege against self–incrimination applies to this case.

No United States Supreme Court case squarely pertains to the situation before us. In *In re Gault,* 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), the Court held that certain due process guaranties, including the privilege against self–incrimination, applied to juvenile delinquency proceedings. The Court clearly stated, however, that its holding was limited to the adjudicatory stage. *In re Gault,* at 13. It observed that its holding did not necessarily apply to the post–adjudicative or dispositional process, because the problems of post–adjudication disposition of juveniles "are unique to the juvenile process". *In re Gault,* at 31 n.48.

Escoto claims that *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981) supports his position. In *Estelle,* an adult defendant had been given a pretrial psychiatric examination for the purpose of determining his competency to stand trial. The Court held that the State's subsequent use of the examining psychiatrist's testimony to establish the defendant's future dangerousness at the penalty phase of his capital murder trial violated his privilege against self–incrimination, because he was not advised before the examination that he had a right to remain silent and that any statement he made could be used against him at a sentencing proceeding. The Court stated that "'the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is

invoked, but upon the nature of the statement or admission and the exposure which it invites.'" *Estelle v. Smith, supra* at 462 (quoting *In re Gault,* at 49). It then observed that in this case, "the ultimate penalty of death was a potential consequence" of defendant's statements to the psychiatrist. *Estelle v. Smith, supra* at 462. It reasoned that, "[g]iven the gravity of the decision to be made at the penalty phase," the privilege against self–incrimination applied. *Estelle v. Smith, supra* at 463. However, the Court further stated: "Of course, we do not hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination." *Estelle v. Smith, supra* at 469 n.13.

A number of significant elements distinguish this case from *Estelle.* The factor most critical to the Court's decision in *Estelle* was that the use of the defendant's statements in the penalty phase of the proceedings exposed the defendant to the imposition of the death penalty. The consequences of Escoto's statements to his psychologist were not nearly as grave or extreme, because his case does not involve the death penalty.

Furthermore, the disposition of Escoto within the juvenile justice system was for different purposes than the sentencing of an adult offender.[1] This court has recognized that the purposes underlying the juvenile justice system, and the procedures for effecting those purposes, differ significantly from those of the adult criminal justice system, particularly with regard to sentencing. *State v. Rice,* 98 Wn.2d 384, 392, 655 P.2d 1145 (1982). In the Juvenile Jus-

---

[1]Our consideration of the unique character and purpose of juvenile proceedings is not precluded by the statement in *Gault* that "the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked . . ." *In re Gault,* 387 U.S. 1, 49, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). The Court in *Gault* made this statement in the course of explaining that the application of the privilege against self–incrimination is not restricted solely to criminal proceedings, but also may extend to civil or administrative proceedings, if the statement is or may be inculpatory. *In re Gault,* at 49.

tice Act of 1977, RCW 13.40, the Legislature stated that its intent was to establish a system having primary responsibility for, being accountable for, and responding to the needs of youthful offenders, and further, to hold youth accountable for their offenses. RCW 13.40.010(2). On the other hand, the Sentencing Reform Act of 1981, RCW 9.94A, does not state a policy of responding to the needs of offenders. Thus, whereas punishment is the chief purpose of the adult sentencing system, the disposition of juveniles under the Juvenile Justice Act of 1977 is guided by the dual purposes of rehabilitation and punishment. *State v. Rice, supra* at 392–94. *See also In re Smiley,* 96 Wn.2d 950, 953, 640 P.2d 7 (1982). The Legislature clearly intended that the court should consider both of these purposes in making a finding of manifest injustice in juvenile proceedings. RCW 13.40.020(12) defines "manifest injustice" as "a disposition that would either impose an excessive penalty on the juvenile or would impose a serious, and clear danger to society *in light of the purposes of this chapter*". (Italics mine.)

The rehabilitative purpose of dispositions under the juvenile justice system not only distinguishes Escoto's case from those involving sentencing of adult offenders, but provides a compelling reason for permitting the trial court to use the results of a psychological evaluation in making a manifest injustice finding. A psychologist's report such as the one used in this case makes a substantial contribution to the court's understanding of the child's need and capacity for rehabilitation. If the court is precluded from considering such information in determining the disposition of a juvenile, the resulting disposition will not adequately effectuate its intended purpose of rehabilitation.

It is essential to consider the applicability of the privilege against self–incrimination to the circumstances of this case in light of the unique rehabilitative purpose of the disposition of juveniles. Because it is crucial for the court to have access to information obtained from the psychological evaluation in order to fulfill the purpose of rehabilitation when making a manifest injustice finding in juvenile proceedings,

I believe that less stringent application of the privilege against self–incrimination is warranted under these circumstances than in an adult setting.[2]

In summary, I would hold that the privilege against self–incrimination is not implicated when the court uses the results of a psychological evaluation as a basis for a finding of manifest injustice in juvenile proceedings. Because of my conclusion on this issue, I would not reach the issues raised concerning waiver of the privilege against self–incrimination and the Sixth Amendment.

DORE, J. (dissenting)—Tony Escoto was compelled to participate in a psychological hearing designed to increase the amount of time he would spend in detention. The court did not allow him to remain silent, and the court then used the results of the evaluation as a basis of a "manifest injustice" finding that had the effect of increasing his detention sentence from a maximum of 28 to 80 weeks. I believe this compelled psychological investigation violated Tony's Fifth and Fourteenth Amendment rights against self–incrimination, and that his sentence of 80 weeks should be reversed and the case remanded for new sentencing.

FACTS

Only by glossing over the facts and completely ignoring an issue raised on appeal can the majority reach the result it does. I therefore begin with a more complete recitation of the events leading up to this appeal. Tony Escoto is 13 years old. During the previous 2 years Tony has been convicted of eight criminal offenses. Recently he pleaded or was found guilty of malicious mischief, three counts of simple assault, and second degree theft. He received a 30–day

---

[2]It could be argued that *State v. Whittington*, 27 Wn. App. 422, 618 P.2d 121 (1980) demands a contrary result. I believe that *Whittington* should be limited to its facts and that *State v. Beard*, 39 Wn. App. 601, 694 P.2d 692, *review denied*, 103 Wn.2d 1032 (1985) suggests a more reasonable approach to analyzing constitutional issues surrounding manifest injustice proceedings under the Juvenile Justice Act of 1977. *See State v. Beard, supra* at 606.

sentence for the malicious mischief conviction and a 90–day sentence for the assault convictions. Pursuant to the Juvenile Justice Act of 1977, the standard range for the theft conviction would have been between 21 and 28 weeks.

The trial court, however, despite a voluminous social history describing Tony's behavior, decided that before pronouncing sentence, it would be useful to have a psychologist evaluate Tony and recommend what would be the best method of dealing with his criminal behavior. The court ordered Tony to participate in such an evaluation *despite repeated objections by Tony's counsel that the evaluation violated Tony's privilege to be free from self–incrimination.* As a result of statements made by Tony during the course of the evaluation, the psychologist recommended that the trial court sentence Tony to 2 years' detention by making a manifest injustice finding pursuant to RCW 13.40.160. The trial court agreed with the psychologist and, basing its findings explicitly on the psychological evaluation, imposed a sentence of 80 weeks.

Tony appealed the manifest injustice finding to the appellate court, which certified the case to us. The King County Prosecutor, who originally charged Tony with the various offenses and supported a manifest injustice finding, has abandoned that position and now argues, with Tony, that the compelled participation in the psychological evaluation violated Tony's privilege against self–incrimination. The Pierce County Prosecutor, a stranger to these proceedings, has filed an amicus curiae brief and argues for affirmance of the sentence.

### CONSTITUTIONAL PROTECTION AGAINST SELF–INCRIMINATION

The United States Supreme Court has held that due process protections apply in juvenile criminal cases. *In re Gault,* 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). The due process rights include the right to have notice of the charges, to have counsel and to confront the witnesses. *In re Gault, supra; In re Winship,* 397 U.S. 358, 25 L. Ed.

2d 368, 90 S. Ct. 1068 (1970). Nevertheless, the majority concludes that Fifth and Fourteenth Amendment due process guaranties do not extend to the situation before us, when a juvenile is compelled to participate in a psychological hearing and the results of that hearing are used to treble his detention sentence.

I note a conspicuous lack of authority for the majority's contention. The majority distinguishes—incorrectly in my opinion—the Supreme Court decision in *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981) and our decision in *State v. Ammons,* 105 Wn.2d 175, 713 P.2d 719, 718 P.2d 796 (1986) which offer Fifth and Fourteenth Amendment protections in similar situations. Then, instead of pointing to legal authority supporting its contention that the privilege against self–incrimination does not apply, the majority implies that the need to gather thorough information about a juvenile to assist in rehabilitation justifies the presentencing evaluation. The majority is correct that one of the primary purposes of the Juvenile Justice Act of 1977 is to rehabilitate the juvenile. *E.g., State v. Rice,* 98 Wn.2d 384, 393, 655 P.2d 1145 (1982). However, the majority is incorrect in its assumption that gathering information about a juvenile while at the same time violating the juvenile's constitutional rights would in fact aid in such rehabilitation.

In *In re Gault, supra,* the United States Supreme Court at length criticized the attitude that due process concerns should not apply in juvenile proceedings:

> Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. In 1937, Dean Pound wrote: "The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts. . . ." The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment. The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established princi-

ples of due process have frequently resulted not in enlightened procedure, but in arbitrariness.

(Footnote omitted.) *Gault,* at 18–19. Juvenile proceedings must not violate due process rights, such as the privilege against self–incrimination.

Furthermore, recent studies have indicated that the informal procedures designed to rehabilitate the juvenile at a cost of denying his or her due process rights are misguided. One study, conducted in the state of Washington, suggests that the use of a formal "legal due process" juvenile system made the juveniles believe the system was fair, and consequently the offender was "more likely to become rehabilitated because of his perception of the legitimacy of the rule of law . . ." Comment, *Juvenile Court: The Legal Process as a Rehabilitative Tool,* 51 Wash. L. Rev. 697, 701 (1976).

A similar belief was echoed by the President's Commission on Law Enforcement and Administration of Justice in a task force report on juvenile delinquency, which stated:

> In theory the court's operations could justifiably be informal, . . . because it would act only in the best interest of the child. In fact it frequently does nothing more nor less than deprive a child of liberty without due process of law—knowing not what else to do and needing, whether admittedly or not, to act in the community's interest even more imperatively than the child's. *In theory it was to exercise its protective powers to bring an errant child back into the fold. In fact there is increasing reason to believe that its intervention reinforces the juvenile's unlawful impulses.*

(Italics mine.) *Recent Development,* 47 Wash. L. Rev. 183, 184 (1971). Tony's compelled psychological evaluation violates his due process rights guaranteed by the Fourteenth Amendment, and cannot be justified by a misguided belief that such a denial of constitutional protection is for Tony's own good.

Furthermore, the majority fails in trying to distinguish this case from the decisions in *Estelle* and *Ammons,* in which the privilege against self–incrimination did protect

individuals in criminal sentencing phases from providing information which would increase their sentences. In *Estelle* the Supreme Court considered whether due process safeguards precluded a psychiatrist from testifying against the defendant at the penalty phase of a death penalty case. The psychiatrist had interviewed the defendant prior to trial in order to determine the defendant's competency to stand trial. Although the defendant had not knowingly waived his *Miranda* rights at the time of the interview, the trial court nevertheless allowed the psychiatrist to testify that, on the basis of his interview with the defendant, he believed the defendant would likely commit other crimes in the future. The jury sentenced the defendant to death. The Supreme Court reversed, ruling that the right against self–incrimination

> *does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the state-ment or admission and the exposure which it invites."*
> *In re Gault,* 387 U. S. 1, 49 (1967) [due process protec-tions apply to juvenile cases].

(Italics mine.) *Estelle,* at 462. It did not matter that the statements the defendant made were not used to determine his guilt; their use, however, to increase his sentence vio-lated his due process rights.

The majority seeks to distinguish *Estelle* because it was a death penalty case, and relies on a footnote in which the Supreme Court allowed the possibility that some types of interviews did not involve Fifth Amendment protections and therefore did not require a knowing, intelligent and voluntary waiver of *Miranda* warnings. I see no logical rea-son for distorting such a footnote beyond all reasonable limits. The clear thrust of *Estelle* was that the Fifth Amendment protects an individual from being compelled to testify against himself if the penalty which the individual will suffer will increase as a result of the testimony. *Estelle,* at 468.

Furthermore, this court's decision in *State v. Ammons, supra,* also provides clear guidance which the majority

ignores when deciding this case. In *Ammons* we held that the privilege against self–incrimination applied at the sentencing stage of a criminal trial. We ruled that a defendant could not be required to tell the court his or her criminal history during the sentencing phase as such history would have the effect of increasing the sentence the defendant would serve. "[T]he State must 'produce the evidence against [the defendant] by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips.'" *Ammons,* at 184–85, quoting *Estelle,* at 462.

The majority, however, distinguishes *Ammons* on the grounds that that case involved adult offenders being sentenced under specific provisions of the sentencing reform act and this case involved a juvenile offender. I do not see why such a distinction matters. That part of the *Ammons* decision was based on our belief that the Fifth and Fourteenth Amendments protect an individual from the additional penalty which would result from his or her forced testimony. An identical situation exists here, when the juvenile, by virtue of his compelled testimony, had his detention sentence trebled.

Furthermore, the Legislature granted to juveniles the same protection against self–incrimination as adults. RCW 13.40.140(8) provides, in part, that "[a] juvenile shall be accorded the same privilege against self–incrimination as an adult." If adults need not provide information which could only enhance their sentences after trial because of their Fifth Amendment rights, then by statute, neither must juveniles.

Nevertheless, the majority countenances disparate treatment of juvenile and adult privileges against self–incrimination. I believe this holding is directly contrary to statute, violates the Fifth and Fourteenth Amendments, and is contrary to sound public policy. I would reverse and remand for resentencing with no weight whatsoever to be given the psychological hearing.

## SIXTH AMENDMENT PROTECTIONS

Even more egregious is the method in which the majority suggests that Tony waived his right to be free from self–incrimination. The majority can only make a colorable waiver argument by mischaracterizing the facts and then completely ignoring an issue raised on appeal, briefed before this court, and presented by both sides during oral argument.

The majority suggests that Tony, by voluntarily participating in the psychological evaluation, waived whatever Fifth and Fourteenth Amendment protections which he may have had. Majority, at 6. At the risk of being repetitive, I will quote from the same record the majority cites, only this time I will not omit that part of the record that indicates that Tony was not aware he had the right to remain silent, and that Tony's counsel was not in a position to recommend to Tony not to participate without a serious danger of being found in contempt of court. After Tony's counsel had objected to the evaluation on Fifth Amendment grounds, and the court had nevertheless ordered the evaluation, the following exchange took place:

> MR. DEBRULER: Your Honor, for the record I am left somewhat in doubt as to how to proceed in this: my advice to my client, I want to make that clear to the Court so that we don't waste time outside of court, . . . My advice to my client would be under the Fifth Amendment to refuse to participate in any evaluation whatsoever.
>
> THE COURT: Well, if that is done then the State can let me know about it, and make a motion if they want, or whatever, but I am not confronted with that right now, Mr. DeBruler, so I am not going to make a ruling on it. The ruling now is the Court is ordering an evaluation, and I believe it was also at the request of the probation counselor so that if there is a refusal to participate, we will simply have to deal with that at the time, I am not making any ruling on it right now. Thank you, counsel.
>
> . . .
>
> MR. DEBRULER: And also I would like to state for the record my concern of course is being held in contempt or

having my client being held in contempt for having refused to comply with a court order.

Report of Proceedings, at 6–7 (Oct. 25, 1985).

While it is clear that a waiver of due process rights may occur by implication in a juvenile setting, *State v. Ellison,* 36 Wn. App. 564, 676 P.2d 531, *review denied,* 101 Wn.2d 1010 (1984), I am at a loss to see how anyone looking at the *entire* record of proceedings could rule that, considering the totality of the circumstances, such a waiver occurred. That Tony's counsel chose not to participate in the psychological hearing or to advise his client to remain silent is understandable given the decision of the trial judge to proceed with a psychological investigation regardless of the effect on Tony's due process rights. The majority's conclusion that Tony or his counsel waived any such rights is simply not supported by the record.

Even more troubling, however, is the majority's total disregard of another issue presented to this court. Tony has argued that his Sixth Amendment right to effective assistance of counsel was violated because his attorney did not advise him to remain silent. While I would not reach this issue because I believe no waiver existed and Tony's Fifth Amendment right was violated, the majority's holding on the waiver issue requires it to discuss whether or not Tony had received effective assistance of counsel. Its failure to do so is inexcusable.

The United States and Washington State Constitutions guarantee the right to effective assistance of counsel. U.S. Const. amend. 6; Const. art. 1, § 22 (amend. 10). This right to effective assistance of counsel exists at every stage of the proceedings and is equally applicable to juveniles as well as adults. *In re Gault,* 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). In order to establish ineffectiveness of counsel, Tony must establish that his counsel's assistance fell below an objective standard of reasonableness and this fact prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *State v. Jury,* 19 Wn. App. 256, 576 P.2d 1302 (1978). Assuming, for the sake

of argument, that the majority is correct and that Tony waived his right against self–incrimination, then it is clear that Tony did not have effective assistance of counsel.

Tony's attorney was obviously concerned about the effect the psychological investigation would have on sentencing. Tony had committed numerous nonviolent offenses, and it was apparent that the purpose of this evaluation was to enhance Tony's sentence. Yet, after the objections at the hearing, Tony's counsel did not attempt to prevent the evaluation or attend the evaluation, nor did counsel recommend that Tony remain silent. Counsel simply absented himself from further participation in the evaluation process. If Tony's conduct is seen as a waiver of his Fifth and Fourteenth Amendment rights, then clearly his counsel should have done more, and should have clearly and unequivocally communicated to Tony that he could have remained silent.

That Tony's counsel did not can only mean that one of two alternatives occurred. First, the trial court's conduct coerced Tony into participating and Tony's counsel into relenting, in which case no waiver occurred. Alternatively, Tony's counsel should have attempted to prevent this waiver by advising Tony not to participate in the psychological evaluation. It is either one or the other, and in either event Tony's constitutional rights were impermissibly violated.

## CONCLUSION

I am deeply disturbed by the way in which the majority disposes of this case. Only by ignoring facts and leaving out a constitutional issue properly raised and argued on appeal can the majority reach the result which it does on the question of whether Tony's compelled participation in the psychological evaluation was constitutional. I do not see how such participation, under a thinly veiled threat that failure to cooperate would constitute contempt of court, is a knowing, intelligent and voluntary waiver of a constitutional right. However if the conduct did constitute a waiver,

then Tony's counsel was under a duty to advise his client, which he clearly failed to do. This failure denied Tony effective assistance of counsel.

Furthermore, Tony had the right to remain silent and not participate in an evaluation which was used to treble his detention sentence. As the United States Supreme Court stated, "Just as the Fifth Amendment prevents a criminal defendant from being made '"the deluded instrument of his own conviction,"' it protects him as well from being made the 'deluded instrument' of his own execution." (Citation omitted.) *Estelle,* at 462. These same concerns are relevant here and prevent us from allowing the trial judge to compel an evaluation which violates Tony's privilege against self–incrimination. Tony may not be deluded into providing the evidence which would treble his detention sentence.

I would remand to the trial court for resentencing of Anthony J. Escoto with the instruction that the entire psychological evaluation be prohibited from being used.

PEARSON, C.J., and UTTER and GOODLOE, JJ., concur with DORE, J.